The next case up is 20-1077 Manan v. State of Colorado. Counsel, if you would, please prepare to argue. Good morning, your honors. May it please the court, my name is Ralph Lamar and I represent Stephen Mannan, the plaintiff appellant in this case. Before I begin with my summary description, I would like to reserve three minutes and I will pay attention to the timer, although I don't see it currently yet, but in rebuttal. The Americans with Disabilities Act was a sweeping set of legislation designed to keep people with disabilities in the workplace. And under Title I, the employment provisions, the employer's duty to provide a reasonable accommodation is the absolute bedrock for the employment provisions of the ADA. And the mechanism for that reasonable accommodation duty is the interactive process, although it's not mentioned in the statute itself, the case law very clearly shows that the interactive process is a vital part of this. Mr. Mannan requested a job modification to be able to work in a unit that was a normal part of the operations of the prison that he worked in, in order to get hip replacement surgery. The DOC, in the form of Warden Long, did not engage with the, in the interactive process with Mr. Mannan. Mr. Mannan worked in the unit for approximately three weeks. The warden thought that that was a potentially reasonable accommodation. Due to a snafu, Mr. Mannan was asked, was taken out of the unit and told, you need to get new restrictions. The new restrictions that were issued were the same with regard to physical limitations. The only difference was that his PA said, another three months. Warden Long saw those restrictions and said, I'm sorry, I've decided that based upon the needs of the facility, we won't let you come back to the unit anymore. Mr. Lamar, could you address, could you address how assignment to the control room would have allowed Mr. Mannan to perform the essential functions of a correctional officer? Your Honor, the same way that a leave of absence would. So while he was not able to do all of the walking, standing that most of the officers did on a regular basis, he could have once he had surgery. And so the same analysis applies for a job modification situation where it's not a made up position or it's part of the normal operating facilities for the prison. He could have done that on a short term basis so that when he had that treatment that was reasonably recommended and they reasonably hoped that it would be effective, he could then return to all of his essential functions. And with regard to leave, the courts have typically interpreted that because the employers have said, well, attendance is an essential function. And if you can't attend, then you're not doing your essential functions. But the courts have interpreted the duty to provide leave as saying he could perform his essential functions in the near future. But didn't he need to give the department an idea at least of when he was going to get the surgery and how long the recovery was going to take? Wasn't that kind of left open ended? Well, Your Honor, the problem here is from the employer's perspective. Mr. Mannin is not an HR expert. He doesn't have a higher education degree. And under EEOC versus C.R. England, there are no magic words that Mr. Mannin needs to use. All he needs to say is, hey, I've got a disability and I want to be able to work. And so he filled out the form and said, yeah, I want this transitional duty assignment. I've got these problems with my hip that lead to limited issues with standing and walking. And at that point in time, the duty was on Warden Long to say, well, let's have a conversation. Let's find out exactly what the nature of your condition is. Is it something that might improve in the future? Do you have any treatment modalities that might work? I really don't know enough to talk to you about how long we might need to accommodate you. And when he got the extension in August, instead of having that conversation at that time, he simply sent him a letter that basically said, I'm not even going to explain to you the real reasons. I'm simply telling you, you're not going to work in this unit anymore. And under Davol versus Webb, the 10th Circuit followed Supreme Court precedent, which said that plaintiffs or litigants are not required to engage in a futile act or a futile gesture. And to the extent that there's any question whether Mr. Mannin should have contacted the warden, the defendant's litigation strategy basically says, we weren't going to give him any more time in this unit. So they haven't said, if we'd only known. That's not their defense. Their defense is, no, he doesn't get any more time. So a jury could certainly find that Mr. Mannin was not at fault with the interactive process breaking down. And under the Taylor versus Phoenixville School District, that's a decision for a jury to determine who was responsible for the breakdown in the process, if any. And that if there was a breakdown and there were issues about the employer not knowing enough, if the employee did enough, and in this case, he never refused to answer any questions. And I point to the court, and it's at JA 229. The warden's memo telling Mr. Mannin that the prison was not going to allow him back into the MCU unit, a copy of that was sent to Jennifer Murphy, the ADA coordinator. There was no communications from Ms. Murphy to Mr. Mannin saying, oh, let's talk about this. This is the reason why the warden did it. We're unsure of any more information. They simply said, no. So it wasn't a question of whether Mr. Mannin didn't properly communicate with the employer. And in fact, in my primary brief, Williams versus Philadelphia Housing Authority is a very analogous case. In that case, Mr. Williams was a police officer for the Philadelphia Housing Authority, suffered from PTSD, couldn't use a gun. There were some issues with his psychiatrist thought that he shouldn't carry a gun for three months, but there was no guarantee that at the end of the three months he would be able to carry a gun. But as soon as he received that release, he said to the Philadelphia Housing Authority, I could work in the radio room, which is a regular position that's assigned to police officers at the Philadelphia Housing Authority or in the training unit, which was also a place where people worked. He asked for both of those. They said, no, you don't understand. We reserve not the right not to put you in either of those positions. And they warehoused him. They said, you're going to go home. You're going to be on unpaid leave. And then before the three month period was up, they said, well, you've used up all your leave and therefore we're firing you. Well, do you contend that there's a like example that was available to Mr. Mannin? I know there was the dispatch job, but that involved a promotion. I do your honor. And that's working in the MCU and the master indefinitely. No, he wasn't asking for an indefinite assignment. But this played out over months. It went over a year. And the reason that he did not do better get better is because he didn't schedule the surgery, which was because he was overweight. And also another time he said he didn't have any money. That sounds like it's going to go indefinitely. Your honor. No one from the state said to Mr. Mannin, we can only allow you to work for a total of 90 days or a total of 60 days. Mr. Mannin testified in a declaration. If somebody had said to me that this couldn't go until when I wanted it to, because his doctor had said, I'd like you to lose the way. But Mr. But the doctor also said, I'll do the surgery, even if you don't lose the way somebody had said to Mr. Mannin, we really do have to limit it. It's not unlimited. You only get 90 days. He would have had the surgery, but he wasn't given that option, your honor. And with regard to the timing of reasonable accommodations, courts should not allow employers to refuse to engage in the interactive process. And then later to criticize the plaintiff for what he or she did or didn't do after they refused to engage with him. And in fact, in the Williams versus Philadelphia housing authority, nobody criticized Mr. Williams for what happened toward the end. He had been given the right to request an extended leave, and he didn't request an extended leave. Basically what the court said is with regard to issues about the priority of accommodations, we always want to accommodate people in their job. That's the goal of the ADA. And so if Warden Long hadn't arbitrarily utilized his quote unquote discretion to limit Mr. Mannin to the 30 days, and it actually called him or the ADA coordinator had said, hey, it can't go until January. Now that we know that surgery can be effective, we can't let it go until January. We can give you 60 days. We can give you 90 days, but you do have to schedule the surgery and you can't put it off. And if they'd said that and said, we'll let you work in the unit until you can get the surgery done, that's what he would have done. But basically what happened to him in early August of 2017 was he was told, we don't want you anymore. We don't need you. And they didn't give him an explanation why. And it was simply the warden's quote unquote discretion. And I'm dismissive of that idea of discretion, your honors, because the ADA was designed to avoid the paternalism that comes with individuals who are in corporations or big governmental entities who say, it's just my decision. They're supposed to have this interactive process. Mr. Lamar, let me just jump in. Could you clarify for us at what points along the way, based on the record, that you contend Mr. Mannin asked for a reasonable accommodation? Was it just one time? Was it multiple times? And when did that happen? I think that would help us in analyzing your case. Sure. When he filled out the forms in July, and in fact, he filled out a form in July, early July, that when he had restrictions, they were more significant. And he went back to his, and he was refused work in the MCU. And he went back to his treating therapist and said, they're not going to let me work in the MCU with those restrictions. And I think I can work in the MCU if you are willing to adjust these. And so they did. And I believe it was July 17. Maybe it was the 13th. But it was an early to mid July, when he was initially placed in the MCU. That was his request for the accommodation. And they gave it to him. They did. And then they took it away three weeks later. But the accommodation they gave him did not cover all the essential functions of the job, correct? It was a temporary placement. No, I'm just asking, did it cover all the essential functions of the functions in the control room, correct? That is correct. So the accommodation was to not make him do the non-sedentary functions. And that's, but those are essential functions. And the law says that with regard to an accommodation, if you can do, perform all the essential functions in the near future, it's not just at the very moment the request is made. And that's why I point out. Well, then go back to Judge Phillips's point about the near future. How do we know it was the near future? How did they know it was the near future? Well, once again, I go back to the Williams versus Philadelphia Housing Authority case. Well, I'm asking more about the facts of this case. What was the department told about when they could expect him to get the surgery and come back? They weren't, Your Honor, because they didn't ask. And because he's not required to. The parameters of asking. Are you arguing that the employer has to manage an employee's physical and medical conditions? Okay, young man, you better get your hip replacement surgery done because we're going to not give your job if you don't get your hip replaced. That's his decision, right? No, Your Honor, he's told. Oh, I see. Hip replacement surgery is not his decision. It's somebody else's. What is it, a babysitting service or something? No, that's not. No, Your Honor. It's a collaborative process. It's a collaborative process. But here's the problem. He filled out an FMLA form in July and August, not an ADA form, even though Warden Long knew that this was a potentially reasonable accommodation. The DOC fell down. And yes, they could have said to Mr. Manning, well, you have a choice. You can either get the surgery in 60 days and have four more weeks for therapy and then come back or you'll lose your job. So your answer to my question is yes. The employer has a duty to manage an employee's medical care. That's not a duty. That would be an amazing new pronouncement from the 10th Circuit. I must say it would be from the whole country, probably make the New York Times or the Wall Street Journal headlines for sure. It's not a duty to manage the care, Your Honor. The employer must manage an employee's health care, decide when he gets hip replacement surgery, etc., etc. I see my time's up, Your Honor. I disagree with your premise, but thank you very much. May I please quote, counsel? My name is Pat Sayes and I'm here for the state of Colorado. We're asking this court to affirm the district court order for two reasons. One, Mr. Manning does not meet the essential functions for a correction officer job, correction officer one position. And two, there's no duty for the Department of Corrections to keep Mr. Manning in a temporary position for an indefinite period of time. Now when we talk about essential functions, what we're talking about is a correction officer one job. That's the position he was hired for. That's the position we held. And we know when we look to determine essential functions, we look at the factors from 29 CFR 1630, job description, employer judgment, etc. Here I think it's important to know what we're talking about is a prison. It's a five over 500 bed facility. It has offenders, all classifications. Now the job description reflects that a correction officer one, the purpose is for safety and security. Now that entails having officers, they rotate throughout the prison, working both indoor and outside security, housing, whatever the case may be. And we know that of the job, 35% is spent on facility access. And that's just like it sounds. It's monitoring people going in and out of the facility, moving offenders to doctor's appointments, etc. We also know that 30% of the job is spent on that aspect of safety and security. And that's just like it sounds, doing offender counts, cell inspections, having to respond to emergencies within the prison. Now, the physical aspects of the job, and there's no dispute about this, and involve having to bend, climb stairs, you might have to crawl, you might have to exert pressure of 100 pounds or more. You have to meet the defense tactics part of the job. And I would note that that aspect, the physical aspect, I think is highlighted by the fact that when you look at the statistics, in the seven month period ending in July 2019, corrections officers had to respond to, I believe was 82 inmate fights. There were 58 inmate assaults. There were 20 assaults on staff, 13 of which resulted in injuries, two of which were serious. Now, Mr. Manning, as we see it, is essentially arguing that when I'm in the control room, I don't need to perform the essential functions of my job because I'm in the control room. Now, we submit that this case. There, what you had was Mr. Martin, who had arthritic knees. He was in a security post, a tower. And what he argued was, I'm not, I don't have to perform the essential functions, physical requirements of my job because I'm in the tower. In essence, what Mr. Martin was saying is, I'm not taking down an inmate every other day. So therefore, judge me by what I was doing in the tower. And this court said, no, what you're saying they told Mr. Martin may well be true. You're not exercising those physical requirements on a daily basis, but dire consequences could result if you can't perform the essential functions of the job. And here we submit that Mr. Manning can't perform the essential functions of the job. Just to be clear on the point you're making, let me ask a question about it this way. When Mr. Manning was given the transitional assignment to the control room in July, was that a reasonable accommodation as that term is used in the ADA? I'll answer it this way. I think potentially, yes, it could have been. However, just to back up, the transitional job that's available, that program throughout DOC, and it's under the auspices of each appointing authority. Here, the appointing authority was Warren Long. And Warren Long said, yes, because Mr. Manning's job restrictions, we're going to put him into the control room, which is what they did. And for that three-week period, then he was in the control. He didn't have to be doing exterior security or any of those other responsibilities. But we submit that what Mr. Manning, and the cases that at least three of the cases he was relying to for this regard, the guard that he should be staying in that position, the Gillen, Holliday, and Shelford cases, a close reading of those cases demonstrates that the positions there were actual positions. They were permanent jobs. You would apply for them online. You would interview for them, just as Mr. Manning did for the correction office position. Okay, I understand the last point you made. But before that, it seems like your answer was a little bit in tension with the Martin case, in the sense that when he was assigned to the control room in July, and really his request to be assigned there for another three months, that would be a situation that did not encompass the whole spectrum of essential functions for a correctional officer. So while it may have been an accommodation to let him work there, was it an accommodation, though, that fits the definition of a reasonable accommodation under the statute? In other words, was the department giving him more than the statute actually would have required? I would say no. I think what the department was doing, in the way that Warren Long was addressing this, the way that any ward, any appointed authority addressed it, if you have someone, as the ward testified to, who has temporary restrictions, then they can be potentially put in this transitional job, which is what happened to Mr. Manning. However, it's a transitional job. By putting him in that job, Warren Long wasn't saying, we're going to keep you there as an accommodation intentionally. When Mr. Manning agreed to the job and filled out the paperwork, it was acknowledged that he was going to be there for three weeks. And when the three weeks ended, then he came back and he said, well, through my medical provider, I can't do this job for my restrictions that are in place are going to be there for another three months. And so therefore, it's undisputed that he couldn't meet the essential functions of the job. And what we submit that Mr. Manning is asking for is either one of three things. Well, before you get into that, hadn't Warren Long extended other transitional assignments for other employees? Why can't Mr. Manning say, look, you did it for them. Why can't you do it for me? There were five employees that Mr. Manning raised in the We would submit to you that. Mr. Mayes, are you still there? Hello. I think council has a fairly poor transmission speed. Can you hear me now? We can hear you now. Yes. Okay. Go ahead. Okay. Let me let me just try to try to continue the other employees. We think your problem is with your Wi-Fi council that you're not having enough signal. Okay. It's showing that it's it's showing that it's up. Can I can I try to fight through here? Sure. Of the five employees, only three were under Warren Long supervision. Of those three, Mr. Manning can't point to any facts demonstrating either testimony or other otherwise that that he was similarly situated with these three employees. We don't know from Mr. Manning's perspective, what was the injury? What was the disability? How long were they going to be in this temporary transitional period? What happened to them? Did they return to whether other jobs or did they not? That's why we submit that the district court was correct in regarding this as incompetent evidence as hearsay. What Mr. Manning did was submit 60, I believe it was 65 pages of job duty rosters and job schedules without any interpretation. Would you agree that our responsibility here as a panel is to determine whether this gentleman has the ability to perform the essential functions of the work and that whether he gets a hip replacement surgery or not is the government, the state, the employer has nothing to do with that whatsoever. You would agree with that? I would agree with that. What is the employee's responsibility vis-a-vis the employer to keep them informed of what his intentions are or can he remain mute and say nothing? I think it's encompassed on the employee to ask for an accommodation. Now, when Mr. Manning asked for an accommodation in February of 2018, what happened was that there was that interactive process that counsel is referring to. Now, as I understand it, counsel saying this should have been done before. This should have been done when Mr. Manning was taken out of his transitional duty. We would submit that the flaw in that argument is that at no time could Mr. Manning meet or point to an accommodation within DOC. I believe it was Justice Phillips pointed out the fact that Mr. Manning looked at, I believe it was a dispatcher job, but admittedly that was a promotion. I believe under the White v. York case, an employer doesn't have a duty to promote someone. In other words, a promotion is not a reasonable accommodation. The dilemma here is we see it that Mr. Manning is asking, there's three things he wants DOC to do. Either restructure his job by eliminating some essential functions, create a job, or to leave him in that temporary position for an indefinite period of time. We would submit that all three of these have been rejected by this court. In the Adar and Smith Midland case, the court said that there's no duty on an employer to either create a job or to leave an employee in a job indefinitely. That was rejected by this court in the Kiesel v. Sublett case, where admittedly that the court was quoting the Seventh Circuit, but what it essentially said was there's no duty on an employer to take what is a temporary job and convert it into a permanent job. We submit that's what Mr. Manning is asking the court to do here. Regarding that, the aspect of leaving an employee in a temporary job, that was also rejected by the courts in the 11th Circuit. Could I just ask you about the interactive process? If I just heard correctly, it sounded like you were saying that any obligation on behalf of the department to engage in an interactive process really didn't kick in until February 2018, but if he asked for an accommodation back in July and then asked for an extension of the temporary assignment, and if that was a request for reasonable accommodation, why didn't the department have to engage in an interactive process really throughout this period of time, and why didn't it fail to do that? I believe that when Mr. Manning, when his second medical provider job restriction came in and they extended it for another three months, we don't see that as asking for an accommodation. But let's say I'm wrong, and let's say you believe that there was a duty, that the department should have done something. Again, I would submit the flaw in the argument is what was it to do when Mr. Manning undisputedly could not meet the essential functions of the correction officer one position, and that's the position that's at stake here. That's the position that he held. So therefore, ultimately, I think what it comes down to is the district court was correct in its review of this case in finding that Mr. Manning was not a qualified individual for purposes of the RA. In closing, I would submit again, we believe the district court got it right, but I would leave the court with this. In, I believe it was the Mason case, this court said that its role is not to sit as a super personnel department, second guessing judgments of employers, and we submit what Mr. Manning is asking the court to do is just that, to either give him a new, create a job for him, keep him in a job indefinitely, or restructure his job so that he doesn't have to meet the essential functions of the position he held, a correction officer one. I thank you for your time and for your attention. Thank you, counsel. Counsel, I think, did you have some remaining time, Mr. Hirono? I don't, Your Honor. You had something further. I was asking about an employer's duty and I want to give you an opportunity to make sure you feel comfortable about your position. So, take a minute for any rebuttal you may wish. All I would add, Your Honor, is that this is summary judgment and the facts are to be interpreted in a way most favorable to Mr. Manning. He's asking for a trial. He's not asking for this court to find that he wins and there's enough facts in the record to do what he needed to under the Rehab Act to ask for an accommodation and that the time for determining whether his request for a reasonable accommodation was in July, not to look back in armchair and say, well, he never got the surgery. They warehoused him and it was inappropriate for them to do that and the jury could find that was inappropriate. Thank you. Thank you, counsel. The case is submitted. Counsel are excused.